UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID SHAEV

      Plaintiff,

v.

MASSACHUSETTS FINANCIAL
SERVICES CO.

      Defendant.

Civil Action No. _____

COMPLAINT

03 CV 12520 MEL

JURY TRIAL DEMANDED

MAGISTRATE JUDGE _____

Plaintiff brings this Complaint based upon information and belief, except for his own actions, which are based upon personal knowledge. His information and belief is based upon the investigation of his counsel, which included a review of regulatory filings, press releases and media reports concerning the conduct alleged herein.

### NATURE OF THE ACTION

1. This is a direct shareholder action for violation of the Investment Company Act of 1940 ("ICA"), 15 U.S.C. § 80a-1 *et seq.* Massachusetts Financial Services Co. ("MFS") is the investment advisor for the MFS family of funds ("MFS Funds"), a position it held during the relevant time period complained of herein. MFS has entered into investment advisory agreements with each of the MFS Funds, pursuant to which it has earned, and continues to earn, millions of dollars of fees each year. Plaintiff owns shares in Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund.

2. MFS procured these lucrative agreements without disclosing that its senior executives had allowed favored clients to engage in "market timing" transactions in shares of MFS Funds, for the personal benefit of its clients. "Market timing" transactions are short-term trades in and out of a mutual fund, for the purpose of exploiting idiosyncracies in the way mutual funds price their shares. Market timing transactions benefitted MFS's favored clients, at the expense of the funds and the rest of their investors. These

transactions also increased the fees charged by MFS by artificially increasing the assets in the MFS Funds and transactional fees charged by MFS.

3.  On December 8, 2003, Sun Life Financial Inc., the parent corporation of MFS, announced that the staff of the Boston office of the Securities and Exchange Commission ("SEC") had indicated that intends to recommend to the SEC that an enforcement action be taken against MFS for, false disclosures in its filings regarding market timing activities and for breaching its fiduciary duties.

4.  It was later revealed that according to letters and memoranda from MFS executives, MFS had allowed favored clients to trade quickly in and out of its biggest funds while publicly representing that it strictly prohibited such transactions. The additional investment in the MFS Funds by these market timers caused the total assets of the funds to be artificially inflated, thereby increasing the fees MFS collected for managing the funds.

3.  Section 15(a) of the ICA, 15 U.S.C. § 80a-15(a), requires that all investment advisory agreements must initially be approved by fund shareholders and must contain a precise description of all compensation to be paid thereunder. These agreements must be initially approved by a majority of fund shareholders, but they can thereafter be extended either by vote of the board of directors of the fund or of the shareholders. The advisory agreements at issue here did not disclose all the additional compensation that was being generated by MFS for allowing favored clients to market time in MFS Funds.

4.  Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b), imposes a fiduciary duty on investment advisors with respect to the compensation earned by them and their affiliates and, at a minimum, requires the advisor to disclose all material facts to the fund directors concerning not only the compensation being earned but also the competence and integrity of the individuals who would be managing fund portfolios and the sufficiency of procedures to assure proper management of each fund. MFS violated this

provision by failing to disclose the complete nature of its compensation as a result of its position as advisor to the MFS Funds.

5. Because the approval of defendant's investment advisory agreement with Plaintiff's Funds was obtained in violation of the ICA, that agreement should be rescinded and/or declared unenforceable or void, pursuant to § 47(b) of the ICA, and all fees received during the past year should be refunded.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over the subject matter of this action pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43; and 28 U.S.C. § 1331.

7. Venue is proper in this District pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, since many of the acts took place in this District.

8. Defendant, directly or indirectly, made use of the means and instrumentalities of interstate commerce, and of the mails, in connection with the acts, practices and courses of business alleged herein.

## PARTIES

9. Plaintiff David Shaev (Profit Sharing Account For The Benefit Of David Shaev) owns shares or units of Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund.

10. The Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund (collectively, "Plaintiff's Funds") are mutual funds that are regulated by the ICA, managed by defendant MFS pursuant to an investment advisory agreements. Plaintiff's Funds buy, hold, and sell shares of other ownership units. During the relevant period, MFS allowed the market timing of these and several other funds for its and its favored clients' benefits and to the detriment of the funds and its shareholders. This action is brought on behalf of and for the benefit of the Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund.

11.   Defendant Massachusetts Financial Services Company ("MFS") is the oldest and currently the eleventh largest mutual fund company in the United States. It is registered as an investment advisor under the Investment Advisers Act of 1940 and managed and served as the investment advisor to the MFS family of fund ("MFS Funds"), which totals, as of December, 2003, 105 individual funds. MFS has ultimate responsibility for overseeing the day-to-day management of the MFS Funds. MFS is a corporate descendant of Massachusetts Investors Trust, which introduced the first mutual fund in 1924. Net assets under the management of the MFS organization were approximately $111.5 billion as of March 31, 2003, and $134 billion as of December, 2003. MFS is paid a monthly management fee based on the average daily net assets of the MFS Funds, pursuant to investment advisory agreements. MFS is located at 500 Boylston Street, Boston, Massachusetts 02116. It is 93% owned by the Canadian company Sun Life Financial Inc. ("Sun").

## SUBSTANTIVE ALLEGATIONS

### Background

12.   A mutual fund is an investment company that pools money from many investors and invests the money in stocks, bonds, short-term money-market instruments, or other securities. Shareholders purchase mutual fund shares from the fund itself (or through a broker for the fund), but are typically not able to purchase the shares from other shareholders on a secondary market, such as the New York Stock Exchange or Nasdaq. The price investors pay for mutual fund shares is the fund's per share net asset value ("NAV"), calculated by the fund each day, based on the market value of the securities in the fund's portfolio, plus any shareholder fees that the fund imposes at purchase (such as sales loads). Mutual fund shares are "redeemable," meaning that when mutual fund shareholders want to sell their fund shares, they sell them back to the fund (or to a broker acting for the fund) at the fund's NAV, minus any fees the fund imposes at that time (such as deferred sales loads or redemption fees).

-4-

13. The investment portfolios of mutual funds are managed by separate entities known as "investment advisers" that are registered with the SEC. Investment advisers are retained by the mutual fund companies pursuant to an agreement which, among other things, details the compensation to be provided by the fund to the adviser. *See* ICA § 15(a), 15 U.S.C. § 80a-15(a). These agreements must be approved by the vote of a majority of the outstanding voting stock of the fund. This is done at the appropriate time through the issuance by the fund of a proxy statement, indicating the need to engage in such an agreement or, as the time might require, amend or renew the agreement. The issuance of proxy statements is governed by the federal securities laws and the rules promulgated thereunder by the SEC. *See* ICA § 20(a), 15 U.S.C. § 80a-20(a).

14. An investment adviser generally employs portfolio managers, who have the discretion to buy and sell securities in the fund's portfolio. Portfolio managers must make investment decisions in accordance with the fund's objectives as stated in the fund's prospectus and cannot make investment decisions that are in their own interests rather than in the interests of the fund's shareholders. Portfolio managers, as investment advisers, owe a fiduciary duty to fund shareholders of utmost good faith, and full and fair disclosure of all material facts. In this case, defendant breached its fiduciary duties by not disclosing the market timing activities in the MFS Funds.

### The Lure And Evils Of Market Timing

15. Securities that trade on exchanges can change price at any time during the trading day, in reaction to relevant information as it becomes available. By contrast, mutual funds are priced only once per day, at 4:00 p.m. Eastern Standard Time, at the close of the major New York markets. At that time mutual funds calculate their NAVs, based on the closing market prices of the securities held in the funds' portfolios. Many funds, and in particular many funds specializing in foreign stocks, calculate their daily prices hours after the closing of the foreign markets, many of which are in different time zones that may be 5-14 hours

ahead of Eastern Standard Time. In some instances, information that may be highly relevant to the pricing of those foreign securities becomes available after those foreign markets have closed, but before 4:00 p.m. Eastern Standard Time. In pricing fund shares for that day, the funds will use the hours-old closing prices of foreign shares held by the fund, even though it may by then be apparent that the price of those shares is likely to rise the following day.

16. This situation creates an opportunity for sophisticated institutions and insiders to take advantage of this time lag by buying funds, at the current day's closing price, and selling them the following day or shortly thereafter, after the foreign market has reacted to the new information, bolstering the fund's NAV. Because shares traded on foreign markets close hours ahead of the New York markets, international funds are often the target of market timers. To be in a position to take advantage of market timing opportunities, however, an investor must know what foreign securities are heavily represented in a given fund's portfolio on any given day. Such information is typically available only to the managers of the fund.

17. Market timing can also take advantage by using hedging strategies such as buying derivatives, or financial instruments that play off what they believe are the holdings of the mutual funds they were timing. These could be futures contracts on the stocks that the mutual funds held, or a contract on a basket of stocks that correlate to the funds' holdings. The market timers could then arbitrage the spread between the two positions, depending on where they expected the mutual fund to trade. Market timers could also profit in a straight momentum play: that is, buying into a fund on a hunch that broader market conditions would increase its value, and then selling quickly when that happened. It is harder to make such a strategy profitable in a long-term bear market, but easier when markets are rebounding strongly, as they did during much of 2003.

18. Market timing is harmful to long-term fund shareholders, because it increases the fund's transaction costs and siphons off a portion of the profits that otherwise would flow solely to those

shareholders. It can also disrupt the fund's stated portfolio management strategy, require a fund to maintain an elevated cash position, and result in lost opportunity costs and forced liquidations. Short-term trading can also result in unwanted taxable capital gains for fund shareholders and reduce the fund's long-term performance. In short, market timing benefits a select few at the expense of the fund and all other fund shareholders.

### MFS Stated Policies Prohibit Market Timing

19. MFS was well aware of the evils of market timing and made public efforts to combat it.

20. The prospectus for both the Massachusetts Investors Trust (dated May 1, 2003) and Massachusetts Investors Growth Stock Fund (dated April 1, 2003) contains the following identical language:

> Exchanges may be subject to certain limitations and are subject to the MFS funds' policies concerning excessive trading practices, which are policies designed to protect the funds and their shareholders from the harmful effect of frequent exchanges . . . .
>
> . . . .
>
> **Excessive Trading Practices.** The MFS funds do not permit market-timing or other excessive trading practices that may disrupt portfolio management strategies and harm fund performance. As noted above, the MFS funds reserve the right to reject or restrict any purchase order (including exchanges) from any investor. The MFS funds will exercise these rights, including rejecting or canceling purchase and exchange orders, delaying for up to two business days the processing of exchange requests, restricting the availability of purchases and exchanges through telephone requests, facsimile transmissions, automated telephone services, internet services or any other electronic transfer service, if an investor's trading, in the judgment of the MFS funds, has been or may be disruptive to a fund. In making this judgment, the MFS funds may consider trading done in multiple accounts under common ownership or control.

21. On November 17, 2003, the prospectuses for both of these funds were supplemented to include the following language:

> **Exchange Limitations Policies.** The MFS funds, subject to the limitations described below, take steps designed to curtail excessive trading practices.

**Limitations on Exchange Activity.** The MFS funds, through their agents, undertake to use their best efforts to exercise the funds' rights to restrict, reject or cancel purchase and exchange orders, as described above, once a shareholder makes

- three exchanges (each exceeding $10,000 in value) out of an MFS fund with a principal investment policy of investing in global, international, high yield bond or municipal bond securities, or

- six exchanges (each exceeding $10,000 in value) out of any other MFS fund,

during a calendar year. These exchange limits may be modified for accounts held by certain retirement plans to conform to plan exchange limits or Department of Labor regulations, and for certain automated or pre-established exchange, asset allocation or dollar cost averaging programs. These exchange limits are subject to the MFS funds' ability to monitor exchange activity, as discussed under "Limitations on the Ability to Detect and Curtail Excessive Trading Practices" below. In applying this policy, the MFS funds consider the information available to them at the time and may consider trading done in multiple accounts under common ownership, control or influence.

MFS' international and global funds will charge a 2% redemption fee (which is retained by the funds) on proceeds from shares redeemed or exchanged within 30 days following the acquisition (either by purchase or exchange) of fund shares made on or after December 8, 2003. See the prospectuses of these funds for details.

**Limitations on the Ability to Detect and Curtail Excessive Trading Practices.** Shareholders seeking to engage in excessive trading practices may deploy a variety of strategies to avoid detection, and, despite the best efforts of the MFS funds to prevent excessive trading, there is no guarantee that the MFS funds or their agents will be able to identify such shareholders or curtail their trading practices. The MFS funds receive purchase and redemption orders through financial intermediaries and cannot always know or reasonably detect excessive trading which may be facilitated by these intermediaries or by the use of omnibus account arrangements offered by these intermediaries to investors. Omnibus account arrangements are common forms of holding shares of a fund, particularly among certain financial intermediaries, retirement plans and variable insurance products. These arrangements often permit multiple investors to aggregate their respective share ownership positions and purchase, redeem and exchange fund shares where the identity of the particular shareholder(s) is not known to a fund.

\* \* \* \* \*

Effective immediately, the first two paragraphs under the caption "Other Information – Pricing of Fund Shares" in the prospectuses of the above referenced funds are replaced in their entirety by the following: The price of each class of the fund's shares is based on its net asset value. The net asset value of each class of shares is determined once each day during which the New York Stock Exchange is open for trading as of the close of regular trading on the New York Stock Exchange (generally, 4:00 p.m., Eastern time) (referred to

as the valuation time). The New York Stock Exchange is closed on most national holidays and Good Friday. To determine net asset value, the fund values its assets at current market prices where current market prices are readily available, or at fair value as determined by the adviser under the direction of the Board of Trustees when a determination is made that current market prices are not readily available For example, in valuing securities that trade principally on foreign markets, the fund uses the most recent closing market prices where available from the markets on which they principally trade, unless the most recent closing market prices, in the fund's judgment, do not represent current market values of these securities. Because developments that could affect the values of foreign securities may occur between the close of the foreign market where the security is principally traded and the fund's valuation time, such closing prices may not be reflective of current market prices and current market prices may not be readily available when the fund determines its net asset value, and therefore the fund may adjust closing market prices of foreign securities to reflect what it believes to be the fair value of the securities as of the fund's valuation time.

24. The language cited above is typical of most of the MFS Funds and reflects a long-standing policy by MFS to prohibit market timing activities in the MFS Funds.

25. Thus, MFS, the funds it managed and the shareholders it served all knew of market timing activities. All were also aware of the harmful effects timing can have on the funds and its shareholders, as well as the fiduciary obligation of MFS to act in the funds' best interest to stop it. Nevertheless, timing activity in MFS Funds, whether expressly authorized or tacitly permitted, continued to the detriment of the MFS Funds and its shareholders and to the benefit of MFS and its favored clients.

**Market Timing By MFS Favored Clients**

26. Beginning as early as 2000, executives at MFS essentially created two classes of funds – a small group of large funds in which they would allow market timing activities, and a larger group of international funds in which they would not. At no time, as described above, did MFS change the language in its prospectuses, which said that market timing was not permitted in any of its funds.

27. In an April 2000 letter warning a Prudential broker against trading in certain funds, Ellen F. Bradley, an MFS vice president, listed a number of MFS Funds that were off-limits to market timers, and others that were "unrestricted" even when traders appeared to be market timing. The "unrestricted funds,"

-9-

were MFS Funds "which at present plan to continue to allow future exchanges," or trades in and out, "even if a pattern of excessive trading has been detected. This list may be changed, with funds added or removed, depending on future volume, sales and exchange activity."

28. In early 2001, a directive was issued by MFS executives to brokers who sold five of the company's biggest mutual funds that these funds were cleared to accept short-term trades, "even if a pattern of excessive trading has been detected." The memorandum directive indicates that top-level MFS executives had become concerned about the harmful effects that market timing was having on their international and smaller funds. "Excessive trading by market timers, particularly in MFS global and international funds, has forced us to adopt a new restriction with regard to exchange policies," the memo reads.

29. The memorandum goes on to list 11 funds that would accept share transactions if the shares had been held for at least 15 days -- a violation of MFS stated policy regarding excessive trading. The list included MFS' flagship, Massachusetts Investors Trust, which the company promotes as "America's first mutual fund," Massachusetts Investors Growth Stock Fund, MFS Emerging Growth, and MFS Bond.

30. According to the memorandum, 37 equity and bond funds were put on a restricted list and would "refuse additional exchanges if a shareholder and/or representative has been involved in excessive trading activity." However, no restrictions were placed on Plaintiff's two funds, Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund, as well as MFS Research Fund, MFS Total Return Fund or MFS Emerging Growth Fund.

31. During the relevant period, market timers moved hundreds of millions of dollars in and out of MFS Funds, to the detriment of the funds and its shareholders.

### The Misconduct At MFS Is Uncovered

32. MFS covered up the market timing by its favored clients for years, and this coverup would be continuing to this day were it not for the investigation of the SEC. It was not until December 8, 2003, that Sun was disclosed that it had been notified by the SEC that the staff at the SEC had recommended action against it for market timing transactions.

33. On December 8, 2003, both MFS and Sun issued a statement. The announcement by MFS read in relevant part:

> As you may have heard, MFS has been informed that the staff of the Boston office of the Securities and Exchange Commission (SEC) intends to recommend to the SEC that a civil enforcement action be brought against MFS alleging, in effect, that the disclosure in certain of MFS' fund prospectuses concerning market timing was false and misleading, and breach of fiduciary duty.
> . . . .
> Until recently, MFS did not monitor daily the trading activity in 11 domestic large-cap stock and high-grade bond funds. . . .
> Nevertheless, as the mutual fund industry moves to further restrict frequent trading, MFS has decided to monitor trading activity in these 11 funds. MFS now has exchange limits on all 105 funds in the MFS fund family.

34. The following day, on December 9, 2003, articles appearing in *The Boston Globe* and *The New York Times* revealed the existence of a company-wide mandate to allow market timing in some funds (including both of Plaintiff's Funds), prohibit market timing in other funds, while maintaining the public perception that absolutely no market timing would be tolerated in any funds.

### MFS's Investment Advisory Agreement Was Misleading

35. Pursuant to section 15(a) of the ICA, 15 U.S.C. § 80a-15(a), investment advisers are retained by the mutual fund companies pursuant to an agreement which, among other things, details the compensation to be provided by the fund to the adviser. These agreements must be approved by the vote of a majority of the outstanding voting stock of the fund indicating the need to engage in such an agreement or, as the time might require, amend or renew the agreement.

36. Advisory agreements may continue in effect for a period more than two years from the date of its execution, only so long as such continuance is specifically approved at least annually by the board of directors or by a vote of a majority of the outstanding voting securities of the fund. *See* ICA §15(a), 15 U.S.C. § 80a-15(a).

37. Fund shareholders are given an opportunity to approve these advisory agreements through the issuance of proxy statements. These proxy statements are governed by the federal securities laws and the rules promulgated thereunder by the SEC. See ICA § 20(a), 15 U.S.C. § 80a-20(a). These rules prohibit the issuance of false and misleading proxy statements.

38. The management of Plaintiff's Funds is governed by such advisory agreements which includes, among others, the compensation to be paid by each fund to MFS. This compensation would be computed and paid monthly as a percentage of the particular fund's assets.

39. The investment advisory agreement did not disclose the fact that MFS was and would continue to allow its favored clients to market time in MFS Funds. MFS never informed the Trustees of the MFS Funds or the shareholders of the MFS Funds regarding this. Rather, MFS continued to inform both the Trustees and shareholders of the reverse, namely, that it would prohibit any such market timing.

40. The effect of this undisclosed market timing was that market timers rapidly moved hundreds of millions of dollars in and out of the funds which artificially inflated the assets of the funds at the time when the advisory fee was computed. As a percentage of the inflated assets, the undisclosed market timing transactions caused MFS to receive inflated advisory fees for its services.

41. Without this material information, the advisory compensation structure which was sought and eventually approved by the fund's Trustees and shareholders was grossly inaccurate since it failed to take into consideration this secret policy by MFS to allow market timing in the funds and to receive additional compensation therefrom.

42.     By failing to disclose this material fact, defendant breached its fiduciary obligations as to the proper amount of its compensation.

### MFS Funds' Trustees Cannot Effectively Supervise The MFS Funds

43.     As of December 31, 2002, there were 112 funds within the MFS Fund complex. Each of the 112 funds has a board of trustees whose function it is to oversee the conduct of the fund's business. All 112 funds are identical in this respect, with the same thirteen person board. The members of the board and their compensation for 2002 is as follows:

| No. | Name | Position(s) at The MFS Funds | Salary for MFS Funds Trusteeship |
| --- | --- | --- | --- |
| 1. | John W. Ballen[1]* | Chairman, Trustee | N/A |
| 2. | Kevin R. Parke[2]* | Trustee, President | N/A |
| 3. | Jeffrey L. Shames[3]* | Trustee | N/A |
| 4. | Lawrence H. Cohn, M.D. | Trustee | $148,006 |
| 5. | Hon. Sir J. David Gibbons | Trustee | $160,890 |
| 6. | William R. Gutow | Trustee | $148,006 |
| 7. | J. Atwood Ives | Trustee | $164,031 |
| 8. | Abby M. O'Neill | Trustee | $146,450 |
| 9. | Lawrence T. Perera | Trustee | $151,574 |
| 10. | William J. Poorvu | Trustee | $161,463 |
| 11. | J. Dale Sherratt | Trustee | $149,006 |
| 12. | Elaine R. Smith | Trustee | $152,574 |
| 13. | Ward Smith | Trustee | $165,334 |

---

[1] Also serves as Chairman of MFS.

[2] Also serves as CEO and Director of MFS.

[3] Also serves as President, CFO and Director of MFS.

* Considered "Interested Trustees" and do not receive compensation from the MFS Funds.

14. As a consequence of overseeing the business conduct of the 112 MFS Funds, the board members are too conflicted, too distracted, and too overburdened to adequately and reasonably oversee the business operation of the MFS Funds, including, Plaintiffs' Funds. The weight of their responsibilities has and continues to preclude adequate oversight with regard to the conduct of the funds and the funds' contractual relationship with its investment advisor and the appropriate compensation to be paid thereunder.

## COUNT I

### (Violation of § 36(b) of the ICA)

15. Plaintiff incorporates by reference the preceding paragraphs.

16. Although this cause of action is brought for the benefit of Massachusetts Investors Trust and Massachusetts Investors Growth Stock Fund., plaintiff brings it directly as a shareholder under ICA § 36(b), 15 U.S.C. § 80a-35(b).

17. Section 36(b) creates a fiduciary duty on the part of all investment advisors, for the benefit of the funds they manage, in connection with the advisors' receipt of fees. This duty applies not only to the terms of the advisory fee agreements, but also to the manner in which advisors seek approval of such agreements. Thus, among other things, § 36(b) prohibits advisors from soliciting the approval of any advisory agreement from a fund board by use of false or misleading information, or by failing to disclose information material to the board's decision regarding their compensation. Information concerning conflicts of interest is particularly important to the funds and to their independent directors.

18. ICA § 36(b), 15 U.S.C. § 80a-35(b), creates a private right of action for all fund shareholders to enforce these duties in a direct action, even though the direct beneficiary of such an action is the fund itself.

19. By permitting, condoning and not disclosing the fact that shares of MFS Funds were being allowed to be systematically market timed by MFS favored clients, MFS breached its fiduciary duties with

respect to the receipt of compensation for services to Plaintiff's Funds and in contravention of the ICA § 36(b), 15 U.S.C. §§ 80a-35(b).

WHEREFORE, plaintiff prays for judgment as follows:

    A.    Rescinding and/or voiding the investment advisory agreement between Massachusetts Investors Fund and Massachusetts Investors Growth Stock Fund and MFS;

    B.    Returning the advisory fees paid by Massachusetts Investors Fund and Massachusetts Investors Growth Stock Fund to MFS;

    C.    Awarding damages for violating section 15(a) of the ICA.

    D.    Awarding plaintiff his costs and expenses for this litigation, including reasonable attorneys' fees and other disbursements; and

    E.    Awarding plaintiff such other and further relief as may be deemed just and proper under the circumstances.

### JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiff hereby demand a trial by jury as to all issues so triable.

Dated: Boston Massachusetts
December 16, 2003

Respectfully submitted,

**BERMAN DeVALERIO PEASE TABACCO BURT & PUCILLO**

*[signature]*

Norman Berman, BBO #040460
One Liberty Square
Boston, MA 02109
T: (617) 542-8300
F: (617) 542-1194

Stanley M. Grossman
H. Adam Prussin
Ronen Sarraf
**POMERANTZ HAUDEK BLOCK
  GROSSMAN & GROSS LLP**
100 Park Avenue, 26th Floor
New York, New York 10017
T: (212) 661-1100
F: (212) 661-8665

*Attorneys for Plaintiff*